We'll hear argument now in the case of National Elevator Industry Plan against Conagra Brands. All right, Mr. Sahan. Good morning, Your Honor. Scott Sam for the National Elevators Industry Pension Fund, City of Sarasota and City of Taylor. This case is a securities action that centers around Conagra's $11 billion acquisition of another grocery wholesale company, Pinnacle, an acquisition that would ultimately increase the size of Conagra by over 30%. Prior to the acquisition, scanner data from grocery stores revealed that two of Pinnacle's three large brands, Duncan Hines and Wishbone, had double-digit declines in sales and the third large brand, Birdseye's, sales were flat as of the time the acquisition was announced. In addition, Pinnacle had cut its promotional spending for the period centering around the time immediately after the acquisition was announced by over 19%. And because Pinnacle had used promotional sales to increase its fledging sales in the period ending in 2017 and the beginning of 2018, immediately prior to the announcement of the merger, it was clear that the reduction of this promotional spend by nearly 20% would also result in continued decrease in sales. You know, that's less than 100%, or at least the tying together of the phenomena that you're describing to fraudulent conduct is difficult for me because I don't see the kind of indicator of demand. It's just they've done something that lowered the price. It increased demand for a period of time. Conagra wanted a different policy. I have to say, as somebody who spent a lot of time doing antitrust, it seemed to me that what Conagra was trying to do was price, you know, higher above marginal cost, if you will. So I'm not sure how great that was, but that was a different issue. But it seems to me they were doing the most ordinary business thing I can imagine, which is just trying to get more money out of their brands, perhaps at the short term cost of getting customers used to a higher price point and a lower level of promotional deals. Your Honor, the fraud in this case is very simple and very clear, and it's actually embedded in the party's briefing. And if I could refer your Honors to page nine of Apelli's brief, this is a duplication of the initial false statement that was made in this case in Conagra. Conagra represented on June 27, 2018, that the key financial metrics as a result of the acquisition, and that is organic net sales, would be equal and adjusted gross margins would increase. Conagra and the Conagra defendants, as a result of the due diligence process, where they had access to the sales information, and again, that's embedded in plaintiff's reply brief, Apelli's reply brief at page 10, showed Conagra had three brands, two of which were on June 27. Were they absolutely declining, or was the rate of growth declining? No, Your Honor. Wishbone and Duncan Hines were both declining by over 15%, and that chart that shows that is embedded in Apelli's reply brief on page 10. It's also part of the complaint, paragraph 79. And if you look at Duncan Hines, and if you look at Wishbone, and this was information that was available on a real-time, weekly basis, the due diligence process, it's admitted in Apelli's brief, commenced in May, two months before the false statement was made. Two of the three big brands, if you look at the arrows, or the blue lines on... So as I recall, Birdseye is in a position, but let me ask you this. Is it your position that every time somebody entering into a merger or acquisition has too rosy a prediction about how it will work out, that there's fraud? Your Honor, once they spoke, and this is the law, Omnicare, United States Supreme Court, TELABS, which I know you're familiar with, once they spoke, yes, yes, and once they spoke and said these two things, they said, organic net sales will not be negatively impacted. They'll be equal. This is not a puffery. Will be is a word that strikes me as worth pausing on. Well, but they don't even say that. If you look at the statement, it says the key financial metrics, the impact of the transaction, which is Conagra acquiring Pinnacle, organic net sales will be sales growth for year-end 2017 and the first portion of 2018, and they say that growth is going to continue. They know for a fact by looking at the scanner data in this due diligence process for this $11 billion acquisition that two of the three brands, the key brands, are negative 15 to 20 percent, and the third brand, Birdseye, which used to have 10 percent growth, is nearing flat. So the growth that had been reported and previously reported to investors was not going to be equal. It was declining, and they knew it. That's a fraud. And once they speak under Omnicare, once they open the door and start talking about these positive factors, growth will be equal. They were required to not hold back this other information that they had access to declining and the growth that they used to have in the third brand had disappeared. That was material information to investors, and the reason we know it's material because it was disclosed in two bits. In November, still during our class period, when JP Morgan, a underwriter defendant, disclosed the sales data, the Nielsen sales data for Pinnacle, the stock went down $2.55 a share, ConAgra stock, 7 percent, and then when the full information was disclosed in December, less than two months after the acquisition was finalized, the stock declined another 30 percent. There's a second false statement here too, Your Honor, embedded in the same slide. False or mistaken? I'm really going to push back on, you would like enough to satisfy the PSLRA and the 9b standards for this, but the district court opinion over and over again says that you didn't provide the specifics that are necessary under those heightened pleading standards. Maybe you should address that. Certainly, Your Honor, the district court focused on what defendants had thrown out in front of the district court channel stuffing, and until abs... Are you still relying on channel stuffing at this point? No, but appellees certainly are trying to hold us to the standard of saying, well, Pinnacle, you know, stuffed this brand on this day using this contract. That's not what we're saying, Your Honor. But all they were doing was, I mean, one could say, and the question is, is this as reasonable an inference as any other? You know, they were, prior to all of these transactions, they were trying to sell more product by providing a lower price, which seems like a fairly routine business decision, and if you want to change that business model, there may be some bumps in the road. But what you can't do as ConAgra, you can't say that we're going to deliver equal sales growth and improve margins when they knew that the margins at Pinnacle were deteriorating. They learned that also in the due diligence process, because the sales that were delivered at year-end 2017 and the beginning of 2018, in order to continue sales growth, required this low ROI promotion. So they knew they couldn't deliver both, and that's the... Pardon me, Your Honor? Low what? I think you said ROI. Yeah, ROI stands for return on investment. I'm sorry, Your Honor. It would help generalists like lawyers if you talk in real words rather than bureaucraties. I apologize, Your Honor, and I think there's a real-world example for this. In ConAgra and Pinnacle are in the same business. We've all gone to the supermarket, and there's Duncan Heinz brownies, which are Pinnacle, and Benny Crocker brownies. They're usually three dollars per box. Every once in a while, you see that the Duncan Heinz or the Benny Crocker are two dollars. So they're eviscerating their margins in order to sell more product, and the Nielsen sales data doesn't just show the amount of sales. Counsel, why is that a securities problem? Well, I understand why it might make for a case study in business school about how they are or are not maximizing profits, but a lot of what you're saying on your feet today and a lot of what I see in your brief seems to boil down to the proposition that every bad business decision violates the securities laws whenever the company says we think we're making good business decisions. No, your honor. The distinction here, Pinnacle did bad business. Pinnacle is not the defendant. ConAgra bought Pinnacle for 11 billion dollars. They went there on the first day when they announced the acquisition. They said we expect top-line growth at sales to continue at the pace both companies have delivered, and with the addition of Pinnacle, we believe we will have improved margin profile. Look, it is clear that they were saying we think we are making good business decisions. We think there is a bright future. Many business executives say that, but I don't see how it could be a serious argument that it violates the securities law to say we think we are making good business decisions, and all the plaintiff wants to show is we're going to show they're bad business decisions. That's not our case, your honor. ConAgra came in. What it sounds like, though. But it's not, your honor. They said sales were equal. They weren't. They had access to the scanner data that showed Pinnacle sales were negative 20%. The market didn't know that. When the market learns that they were buying a company that sales were negative 20% in two of their three brands, the stock collapses. They also said that the acquisition of Pinnacle, it was going to be a positive for margin. And in fact, they knew Pinnacle had been eviscerating its margins by using low return on investment promotions, so they would discount the brownies deeply to increase sales, and that negatively impacted margins. Within two months of the close of this deal- I must say, you're just repeating what seems to me the problem. You are saying over and over, we want to prove that they made bad business decisions. I don't see how it's a securities problem. Your honor, Pinnacle made bad business decisions. Can we focus in? You are describing this, but I think what you're saying is that their predictions didn't turn out to be as positive as they hoped. And there are two possible scenarios there. One is that they were just flat out lying when they said that they thought that these gross margins were going to stay the same. They put up a slide, organic net sales growth, adjusted gross margins, et cetera. They thought one was going to be equal and the other three were going to be better. So scenario one is that they just had an unrealistically sunny prediction because they thought they were such astute business people that they were going to be able to turn around what was going on, and they thought these were solid brands. Wishbone and Duncan Hines and the other scenarios, they're just flat out lying, trying to fool the market. You need facts to tell us why that scenario is at least as compelling as the scenario that their predictions just didn't happen to work out. And actually also in the face of evidence that some of your defendants were themselves making some pretty considerable investments in the company to the tune, I think, adding it up to the tune of about $500,000, which is not small change, which would tend to make you think that they do believe in this merger. So we need to know why it is the inference that they were just flat out lying to the market reaches the telebs point. I'll put it that way. Well, Your Honor, the telebs point, you can't say that sales will Did they know they were about to collapse? How do we know that this is anything more than just an unrealistic, a prediction that turns out not to happen? The scanner data from May of 2018, a month before the statement was made, showed declines of two of the three brands of negative, close to negative 20%. They knew they were declining. And this business about the two You're saying that the number of sales was going up. They just weren't earning as much money. No, no, no, no, Your Honor. And this is where I think there's a disconnect. If you look at appellant's reply brief, page 10, as of the actual sales, the blue line is at negative 20% before they made the statement that sales would be equal. That's a false statement. Sales were already declining radically. And that's why the stock went down over a third when that information was disclosed. Two of the three key brands were in radical decline. At the time, Mr. Conley, Mr. Marburger and Conagra said the pinnacle brands were equal. They learned that by having access to the electronic data room in the due diligence process. And they lied about an existing thing. The business about Cienter that these two individuals put in close to $600,000, a very small amount of their overall holdings, is totally belied by the fact, if you look at the timeline, JANA, which was at one point over 9% of Conagra, it invested as of between February and April before the due diligence, had invested $600 million in pinnacle in order to bring this deal to fruition. So when Conagra, Conley, everyone learned about the negative sales, not future negative sales, but the actual existing negative sales, they didn't reveal that to the market. Because if they did, it would have eviscerated the $600 million JANA investment, which they ultimately cashed out at $120 million profit for $720 million. That's an investment 100 times the size of Conley and Marburger. At its core here, the two competing inferences under teleapps, plaintiff's inference, did the Conagra executives go and do due diligence before they go into the electronic data room and look at this Nielsen sales data that showed current, not future, current actual declines in two of the three brands, and the other brand went from 10% increase to flat before the time they made the statement. Is that at least as equal as defendants Conagra's inference that we invested $11 billion in buying this company, increasing our own company by 30%? We did that all without even looking at basic, what they describe as key financial metrics. How would they even have a basis to say sales are going to be equal and margins are going to be positive if you didn't look at the basic margin and sales information in the due diligence process? It can't be more compelling that they did no due diligence and just learned after spending the $11 billion, conveniently, just a couple months later, even though you've been studying this company for two years and you had a premiumization playbook, a plan to eliminate this channel stuffing and eliminate these low return on investment promotions in order to increase your margins and premiumize, that they only learned that. That cannot be more compelling that you invested the $11 billion without even kicking the tires to look at these declining sales that have already been occurring at pinnacle that were available for basic financial information. And it's just not, it's not, how would they have been able to say that the sales are equal and the sales are positive that you didn't at a minimum look at the basic financial information? And unless the court has more questions, I'll reserve my remaining time for rebuttal. Yes. I understood you to say in answer to one of judge Wood's questions that the allegations about channel stuffing had been abandoned, but I've just gone back and looked at your brief and it's full of allegations about channel stuffing. So are you maintaining those Thank you. All right. Mr. Ritz. Good morning. Your honors may please the court. My name is Jeffrey Ritz from Jones day. I am here on behalf of defendants, Conagra brands, Inc and the officers and directors of Conagra who are named as defendants in the complaint. Uh, in an extremely thorough and scholarly opinion here, covering more than 50 single space pages, the district court correctly concluded that the amended complaint failed for a number of reasons. That conclusion was correct. And the, and the judgment below should be affirmed. I'm going to focus my remarks today on the cyander point, because if this court were to determine that the district court cyander analysis was right, then there would be no need to address any other issue here or the points other than cyander. I'll be happy to answer any questions that the court might have, but I'll otherwise rest on our briefs and on the district course learned opinion. Uh, I do want to note at the start and emphasize that the plaintiffs have abandoned almost the entire amended complaint here. Uh, the securities act claims have been abandoned. They are not addressed in the plaintiff's appeal briefs. Uh, that means that Conagra's directors and the underwriter defendants are out of the case and out of the whole 214 56 page amended complaint. The plaintiff's advanced arguments in their appeal briefs here relating to only two of the alleged misstatements abandoning all of the others. And it sounds as if their case might've gotten even narrower this morning. The only alleged misstatements that the plaintiffs address in their appeal briefs are those in paragraph 62 and 63 of the amended complaint. Those were statements by Conagra on June 27th, 2018, the day that it announced the proposed pinnacle transaction. And both of those statements were to the effect that Conagra generally expected that the transaction would lead to growth and to improve margins and profits. So was there anything about a time period in that statement? No, that, and that's an important point. Your honor, neither of these statements addressed any numbers, neither of them addressed any percentages, neither of them addressed any timeframes, even in general terms. They simply said our expectation, uh, in essence is that the merger is going to result in growth and improve margins and profits. Didn't say if it would be the day after the merger closed a month later, a year later, two years later, whatever. Now the plaintiffs say that those statements were false because Pinnacle supposedly was engaged in channel stuffing or low return on investment promotions or other unspecified bad habits. And they say that Conagra knew about all of that stuff before it agreed to buy Pinnacle. And yet for some reason decided to conceal it all and pay a premium price for Pinnacle anyway. Do we, do we need to have some reason to think that Conagra would want to shoot itself in the foot, uh, through this acquisition? Uh, there is no reason why Conagra would want to shoot itself in the foot here, your honor. And none is alleged with, with any particularized facts here. And that is part of why the plaintiff's proposed Siander, um, inference here fails. Now the district court correctly found that the particularized facts in the complaint failed to give rise to a strong and cogent Siander inference that was at least as strong as any competing non-fraudulent inference. And the district court was right for three main reasons. First and foremost, the complaint does not identify a single specific document or a single specific item of data that existed as of June 27th, the date of the challenge statements, but related to channel stuffing or low return on investment promotions or bad habits, or anything like that. There is nothing. What about something simple like Conagra says, we think, uh, that these brands will be profitable to us. Um, and as a matter of fact, they, they know having looked at available data that those brands are slipping. Just at least hypothetically, would that be the kind of misstatement that it should add to the Siander point? Well, in, in order to have a strong inference of Siander, you would expect particularized facts that would show that as of the time of the challenge statement, there was actual, actual documents or data or communications that contradicted the challenge statement. What about the inference that in the due diligence process prior to the transaction, uh, Conagra would have looked at that kind of, I'm sure it's proprietary data to a certain degree, but they would have looked at it to see what the real situation was at Pinnacle. Yeah, I have, I have a few thoughts on that. Your honor, the due diligence argument that the plaintiffs make here is an essence and access to records type of argument, which courts and PSLRA cases generally reject. They generally say in securities cases that you cannot base a strong inference of Siander on should have known or must have known allegations. And they instead require reference to particularized facts such as documents or data or confidential witnesses or something like that, that, that puts meat on the bones of, of the must have known assertion. Now, of course, there's due diligence in every M&A transaction. That doesn't mean that there's always Siander if the post deal results do not immediately match up with expectations. In courts and securities cases are skeptical of Siander arguments that would apply indiscriminately. You could say in any merger case, well, there was due diligence, therefore there must be Siander if, if, if, if the deal didn't immediately worked out as expected, but courts don't, don't, don't accept wholesale Siander arguments such as that. And, and even more important, there aren't any particularized factual allegations in this complaint about anything that was provided to Conagra during due during due diligence and, and specific facts that, that a, that a particular document would have revealed channel stuffing or low return on investment promotions or something. Or just a declining brand, a brand that was losing its attractiveness to consumers and that was likely to be something that Conagra would ultimately shed rather than have it dragged down Conagra's Well, Your Honor, there aren't any particularized facts about, about that either. And what matters are particularized facts that existed back in June, 2018, when the proposed deal was announced, not facts that, that, that came to light later on. And this slide that the plaintiffs referred to in their, in their reply brief, that's something that was created in, in February, 2019, I believe. So nine months later, everything on the right from, from the center to the right side of that slide are things that happened after the challenge statements here. What, what is on the left side of the slide, it was the bird's eye sales were higher year over year as of the date that the, that the merger was announced and Duncan Hines and Wishbones percentage sales growth was, was slightly negative compared to the prior year. But none of these slides show what Conagra expected or believed would be the case after the merger would, would close several months later, much less what the long-term results of, of the combined company would be. And of course, the statements, the challenge statements on June 27th were not statements about what the expectations were for the Duncan Hines brand in particular, for example, or Wishbone or Birdseye, they were statements generally about the expected performance of the combined company, the whole thing, not just one brand here or one brand there. So there's this failure of particularized facts that existed at the time of the challenge statements that actually contradicted those challenge statements. And that's, that's a critical failure, not only as to the Cyander inference, your honor, but for the requirement of, of contemporaneous falsity, which must be pleaded with particularity in any rule 10B5 case. In addition to not identifying any specific documents or items of contradiction, the amended complaint also doesn't cite any documents or communications to suggest that any of the defendants actually believed or understood as of June 27th, that Pinnacle was engaged in channel stuffing. So could I ask you though, I mean, one of the things that troubles me sometimes about the type of argument you just made is the, the very strong lack of probability that there are such documents. It's hard to imagine that the executives of ConAgra would have written down something along the lines that you said. And so what plaintiffs need to do is they need to present in their complaints the best circumstantial evidence they have from that. That's actually what the PSLRA tells them to do if they don't have, you know, the smoking gun document. And so we need to look at the complaint to see if the facts that it's able to gather together would lead to, you know, this inference, not just, you know, somebody saying, you got me, you know, I'm sorry, I lied to everybody. That's, that's true. And in a lot of these securities complaints, your honor, as I'm, I'm sure, you know, you'll see allegations that refer to confidential witnesses, somebody from one of the companies. Surely that's not a sine qua non. I mean, it's helpful if you get a whistleblower or a confidential witness, but no one has ever said that's essential. That's right. And I'm not saying that your honor, I'm just saying, I'm just pointing to the lack of particularized factual allegations in this complaint that tend to show that not only the thing that was supposedly being hidden actually existed at the time of the challenge statements, but that the defendants understood it or appreciated it. But I take it that you do agree in a complaint that that function could be performed by a couple of paragraphs setting out the specific circumstantial evidence that they have, as opposed to just a flat out statement. Yeah. Yes, your honor. And, and this complaint doesn't, doesn't, uh, doesn't clear that bar. Um, but the third main reason that, that the district court was correct in finding that there was no, no cogent, compelling inference of Sander is it's one that you noted before, your honor, the absence of insider sales here and the presence of significant insider purchases. Uh, ConAgra CEO, Mr. Connolly and CFO, Mr. Marburger, both made significant purchases during the proposed class period, which, uh, the case law of this court suggests that's significantly against a Sander inference. So the utter absence of particularized allegations about contemporaneous documents or data or communications that were at odds with the challenge statements combined with the absence of insider buying and the presence of significant insider selling all make it next to impossible to say that there is a strong or cogent inference of Sander here. Now the plaintiffs have made several arguments in favor of a Sander inference, none of which holds water. First, they have, uh, pointed to what they characterize as post-class period admissions, pointing to statements that the company made in its December 2018 earnings call six months after the challenge statements, two months after the deal closed. Those so-called admissions are no such thing. They do not even begin to suggest that the defendants believed back on June 27, the pinnacle was engaged in channel stuffing or low return on investment promotions or something like that. Those statements in the December earnings call merely described things that ConAgra said it learned and actions that decided to take after the merger closed. In fact, Mr. Connolly said, quote, that this was quote, what we've learned about pinnacle over the past several weeks since the merger closed. And, and, and, and in fact, um, ConAgra said that with reference to these low return on investment promotions, that they were ending quote year-end promotions that we saw as extremely low ROI. That wasn't any kind of admission of knowledge six months earlier. There are no factual allegations in the complaint that those year-end promotions even existed way back in June. There aren't any factual allegations about any promotions or any product that existed as of June 27. Uh, the plaintiffs also point to the due diligence process, uh, uh, to try to create a sign or inference. I addressed that before. There's due diligence in every transaction, and there aren't any particularized allegations here about specific things that the defendants saw in due diligence that contradicted the challenge statement. Um, so is there evidence that once ConAgra actually did have access to everything, basically post-acquisition, it learned new things that caused this to look like not such a great deal? Well, Your Honor, the, the December 2018 earnings conference call, which I just described, Right, right. Barbara both spoke of things that we have learned since the deal closed and decisions that we've made based on that, and that's going to cause the timeline for the expected merger benefits to be pushed out a little bit, which of course isn't unusual in an M&A transaction, but yeah, they, they expressed that this was new stuff that we'd learned since, since, since the deal closed. Um, the plaintiffs also point to the supposed playbook that ConAgra wanted to implement a pinnacle. That's much too broad and unspecific to support a scionder inference as well. In every M&A transaction, the acquiring company thinks it can do things to improve the company that's being acquired. That's why you do deals in the first place. That one is a rid pinnacle of its bad habits of competing on the basis of price. That's how I read it. That's what he said. Yeah, every company would like to charge as much as it can. That certainly is true, but the fact that ConAgra had ideas about improvements it might want to make doesn't remotely begin to suggest that it believed the pinnacle was engaged in channel stuffing or low return on investment promotions at the time of the challenge statements or anything like. The plaintiffs also appeal to the so-called core operations doctrine, which is somewhat shaky in light of the PSLRA, to begin with. The plain language of the PSLRA says that scionder has to be based on allegations of particularized facts and not assumptions. In courts regularly, they do not infer scionder based on people's titles or their positions. The core operations doctrine is in tension with those principles. What the plaintiffs want to do here is to extend the core operations doctrine to a whole new level, to say that it should be used to infer minute, intimate knowledge about the inner workings of a separate competitor company that is operating at arm's length, which these companies needed to do until the deal was closed. I submit that there isn't any basis in the PSLRA or this court's case law to extend to the core operations doctrine in that way. And then the last argument that the plaintiffs make for a scionder inference is to point to the investment firm Jana and this idea that that Conagra somehow wanted to help Jana. This is predicated on the unsupported assertion that Jana was a controlling shareholder of Conagra, but there is no dispute here, your honors, that Jana's stake in Conagra fell below the five before the pinnacle deal was announced, way back in January 2017. So there are no factual allegations that Jana, in fact, controlled Conagra, and there are no factual allegations to show that either Mr. Connolly or Mr. Marburger were in some way beholden to Jana. And the fact that Jana itself bought $200 million of Conagra stock during the class period, more than a third of the shares that were offered in Conagra's secondary public offering in October 2018, is in tension with this theory as well. Presumably, if Conagra had wanted to commit a fraud to help Jana, they wouldn't have sold Jana $200 million worth of artificially inflated stock at the same time. So for all the reasons I've described, your honor, I submit that district was correct in concluding that a competing non-fraudulent inference is much, much more logical and plausible and compelling here. Conagra and its leaders thought that the pinnacle transaction would be a beneficial one, as indeed it has turned out to be. They described their hopes and their expectations for the deal based on the information that was then known to them while making clear that things could change. After the deal closed, Conagra learned information, and made some decisions that resulted in alterations to the timeline for achieving the full benefits of the deal. And they promptly disclosed that to the market. Your honor, that's not only not fraud, that's not even an unusual set of circumstances. There's no strong inference of cyander here, and the judgment below should be affirmed. Thank you. Thank you, counsel. Anything further, Mr. Schaum? Yeah, yes, your honor. The smoking gun here, and I just plead with the court to focus on it, the page 10 of the reply brief, the left side, as Mr. Ritz had said, the left side, they had access to the left side. Duncan Hines, negative 20 percent. Wishbone, negative 15 percent. A full month before they made the statement on June 27th that sales are equal. That's false, and at a misleading under Omnicare. And the Supreme Court under Omnicare says if an issuer has to desist from misleading investors by saying one thing and holding back another. You can't say that sales are equal without providing the context, well, two of the three brands are actually negative 15 to 20 percent, and the third brand is flat. It's no longer 10 percent growth. The case is taken under advisement.